# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **UNILOC LUXEMBOURG S.A.,** *et al.,* | § | |
| | § | |
| **Plaintiffs,** | § | CIVIL ACTION NO. 6:12-cv-968 |
| | § | |
| **v.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **COREL INC.,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Memorandum Opinion construes the disputed claim terms in United States Patent No. 7,024,696 (the '696 Patent). On September 18, 2014, the parties presented arguments on the disputed claim terms at the *Markman* hearing. The Court resolves the claim term disputes as stated and for the reasons discussed below.

## BACKGROUND

On December 21, 2012, Plaintiffs Uniloc Luxembourg S.A. and Uniloc USA, Inc. (collectively "Uniloc") filed the lead action captioned above and its action (6:12-cv-972) against PerkinElmer, Inc. ("PerkinElmer"), the only remaining Defendant in the consolidated case. Uniloc alleges that Defendant infringes the '696 Patent, entitled "Method and System for Prevention of Piracy of a Given Software Application Via a Communications Network." The patented technology relates to techniques for preventing piracy of software applications, such as limiting the application's functionality until it is activated by a remote service provider.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented invention's scope. *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning than it would otherwise possess, or disclaim or

disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The prosecution history must show that the

patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions, LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)). "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (internal quotation omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (internal quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

# CLAIM CONSTRUCTION

### A. Disputed Terms

### 1. "unique identification code"

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| "an alphanumeric sequence that identifies specific software" | "a program code sequence comprised of alphanumeric characters, that serves to identify individual software application" |

The parties' dispute turns on whether the specification provided an explicit definition of this term and inclusion of "program code sequence" in the definition. Uniloc argues the patent teaches that the identification code is an alphanumeric sequence, and "unique" relates to identification of "each individual software sold." Open. Br., Doc. No. 95 at 8 (citing '696 Patent col. 5:38–39). Uniloc asserts that its construction is consistent with the specification as a whole. *Id.* Additionally, Uniloc asserts that Defendant's inclusion of "program code sequence" is not helpful because that term itself requires further construction. *Id.* To refute Defendant's argument that a computer must generate the code, Uniloc points to a disclosed embodiment where a user manually enters the unique identification code. Reply Br., Doc. No. 101 at 2 (citing '696 Patent col. 3:37–63).

Defendant responds that its construction matches the explicit definition provided in the specification: "[i]t is worthy to mention that the software should preferably contain an identification code, which is a program code sequence comprised of alphanumeric characters, that serves to identify individual software application." Resp. Br., Doc. No. 97 at 6 (quoting '696 Patent col. 3:65–4:1)[1] (internal quotation omitted). Defendant contends that the patent

---

[1] Defendants purport to quote the language of the specification but it actually states "[i]t is worthy to mention that the software should preferably contain an identification code, which is a program code sequence comprised of alphanumeric characters, that *would serve* to identify *each* individual software application." '696 Patent col. 3:65–4:1 (emphasis added).

limits the code to a "program code sequence" generated by a computer rather than a code manually created or designated by a human. *Id.* at 7  To support this contention, Defendant cites the surrounding language of Claim 15 and this passage regarding two anti-piracy measures: "[t]he first measure is a program code sequence that identifies the specific software (hereinafter 'identification code'), while the second is an additional program code sequence that would be needed to activate the software (hereinafter 'activation code')." *Id.* (quoting '696 Patent col. 2:59–66).  Defendant further argues that a computer would necessarily have to generate a long program code sequence that would be harder to replicate. *Id.* at 8.  Therefore, Defendant asserts, the specification supports its construction because a long code is the preferred form of an activation code. *Id.* (citing '696 Patent col. 5:57–6:5).

Both parties agree that the code is composed of alphanumeric characters that identify specific software.  Reply Br. at 1.  As Defendant points out, the specification provides definitional language for "unique identification code."  The provided definition fits in the context of both the asserted and nonasserted claims.  Therefore, there is no reason to give the term a meaning different from the one the patentee explicitly intended.  However, the intrinsic evidence does not support the additional limitation that Defendant proposes by its construction of "program code sequence"—one that must be generated by a computer or program.  The passage describing the two-anti-piracy measures quoted by Defendant provides no support for this limitation because it does not specify: (1) that the program code sequence must be a long code; or (2) that the code must be generated by a computer.  Although the additional passage cited by Defendant in support of this construction does refer to long code sequences as "program files," it also describes and gives an example of a short code sequence of only eleven characters.  '696 Patent col. 5:57–6:5.  Moreover, the specification states that the preferred embodiment is a

unique identification code that consists of a short code sequence. '696 Patent col. 4:2–14. For example, a short code sequence may merely be a product's distinct serial number or a sequence of twelve characters. *Id.* Accordingly, Defendant's reliance on a long code sequence, which Defendant asserts must be generated by a computer, fails.

The patentee provided an explicit definition for "unique identification code," but Defendant's narrow construction of "program code sequence" is unsupported. Thus, the Court construes **"unique identification code"** to mean "**a program code sequence comprised of alphanumeric characters, that would serve to identify each individual software application."**

**2. "software application having unique identification code associated therewith," "said software application assigned to such unique identification code," and "assign"**

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| software application having an alphanumeric sequence that identifies specific software associated therewith | software application uniquely assigned to a [unique identification code] |
| software application assigned to an alphanumeric sequence that identifies specific software | said software application uniquely allocated to an existing [unique identification code] designated for the software application |
| The word "assign" does not appear in the claims and requires no construction | to allocate |

The Court construes these three terms together because they all relate to how the unique identification code is assigned. The parties dispute two issues: (1) whether the specification supports using the same identification code for multiple copies of software; and (2) whether the code must preexist the software assigned to it.

Uniloc argues that no additional construction of these terms is needed after the Court's construction of "unique identification code." Open. Br. at 9–10. It objects to the Defendant's

insertion of the term "uniquely" because it creates confusion given that the claims use "unique" in a different sense. *Id.* Uniloc asserts that Defendant proposes to describe the manner in which an event occurs. *Id.* Uniloc asserts that Defendant's own extrinsic evidence shows that "assign" and "allocate" are synonymous, yet Defendant ascribes those words different meanings in its proposed construction. *Id.* at 10. Uniloc disputes Defendant's contention that the manner in which the code is assigned matters. *Id.* at 11. It asserts that none of the claims hinge on how the code is assigned and points to two examples of different manners of assignment in the specification. *Id.*; Reply Br. at 3 (citing '696 Patent col. 5:29–39). Uniloc further asserts that the cited passage shows a single code could be assigned to more than one software application. Reply Br. at 2–3; ." Tr. *Markman* Hr'g 28–30, Sept. 18, 2014. Additionally, Uniloc disputes the chronological limitation asserted by Defendant, requiring the code to pre-exist the software. Reply Br. at 3.

Defendant asserts that the claims terms require an explanation of how the software becomes associated with a code, and that the manner of assignment determines the role played by the identification code. Resp. Br. at 9. Defendant contends that the first term—"software application having unique identification code associated therewith"—is vague but "essentially" construes it synonymously with the second term—said software application assigned to such unique identification code. *Id.* at 10. Defendant argues that "assigned to" requires clarification. *Id.* at 11. Defendant points to Webster's Dictionary that defines "assign" as "to allocate." *Id.* (citing *Random House Webster's Dictionary* 125 (2001) (hereinafter "Webster's Dict.")). In Defendant's view, an item allocated to another "must preexist the latter," meaning that the identification code must preexist the software application. *Id.* Additionally, Defendant asserts that the term "unique" requires identification code to "be unique to the software application." *Id.*

As a first point of clarification, the passage cited by Uniloc to support its assertion that a code could be associated with a group of software, actually refers to an activation code, not an identification code. '696 Patent col. 5:32–37 ("The activation code may either be unique to each individual software sold or unique to a group of software . . . .") (internal parentheses omitted). The specification does not provide similar support for associating the unique identification code with a group of software.

To the contrary, the specification supports Defendant's view that the unique identification code is unique to "each individual software application." '696 Patent col. 3:66–4:1. It provides further support by describing an embodiment where an identification code is unique to each software sold and disclosed to the remote service system such that the system keeps track of each software application sold. '696 Patent col. 4:3–8. At the *Markman* Hearing, Plaintiffs acknowledged that the '696 Patent teaches a one-to-one correlation between the software application and the unique identification code. Tr. *Markman* Hr'g 30, Sept. 18, 2014. The language of asserted Claim 15 itself also makes such a requirement clear. *See* '696 Patent col. 10:38–59. The claim describes the given software application as "said software application having a unique identification code associated therewith" and later refers to "said software application assigned to such unique identification code." *Id.*

However, the intrinsic evidence does not support Defendant's temporal limitation that the identification code must preexist the software application. Defendant does not cite anywhere in the specification that supports that limitation. Instead, it cites a dictionary definition that does not even support that limitation. "To allocate," as Defendant contends "assign" should be construed, is explained by Webster's Dictionary: "To allocate is to earmark or set aside parts of *things available or expected* in the future . . . ." *Webster's Dict.* at 126 (emphasis added). Even

Defendant's own extrinsic evidence, does not support that the identification code must pre-exist the software.

As mentioned above, the explicit claim language itself indicates that the identification code is unique for each given software application. Further, the Court rejects Defendant's addition of a chronological limitation. Having resolved the disputes presented, no further construction is needed. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Therefore, the Court will not provide additional construction of these terms. The Court construes "**software application having unique identification code associated therewith**," "**said software application assigned to such unique identification code**," and "**assign**" to have **plain meaning**. These terms implicitly mean that identification codes are assigned to each individual software application.

### 3. "communications network"

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| construction is not necessary, but if construed: "a group of links and associated equipment that facilitates data communication, such as the internet" | "an interconnected computer system capable of transmitting and receiving data, which allows users of the network to communicate" |

The parties dispute whether the specification provides an explicit definition of this term and whether it limits the term to mean only "interconnected computer systems."

Uniloc acknowledges that the specification states that a communications network "is equally applicable to all interconnected computer systems capable of transmitting and receiving data, preferably digital data, which allows users of the network to communicate." Open. Br. at 21 (citing '696 Patent col. 3:25–27). Uniloc asserts that the specification also discloses at least six other types of communications networks in addition to interconnected computer systems: (1)

telecommunication networks, such as the Internet; (2) hard-wire telephony; (3) cellular networks; (4) PCS systems; (5) satellite networks; and (6) localized and regional networks such as intranets and local area networks (LANs). *Id.* (citing '696 Patent, col. 3:28–36). Uniloc contends that this term should be construed broadly, which is consistent with the specification given the breadth of network examples it discloses. *Id.* Further, it argues that what Defendant identifies as a lexicographic disavowel is actually just another example of one of the forms of communications networks intended to be included in the invention. Reply Br. at 10 (citing '696 Patent col. 3:22–24).

Defendant responds that the patentee intended to define the term explicitly in the specification. Resp. Br. at 22–23 (citing '696 Patent col. 3:22–27). It argues that this construction captures the meaning of a communications network in the '696 Patent because all claims are directed toward software applications on computer systems. *Id.* Defendant contends that the patent claims should not be construed as broadly as Uniloc proposes. *Id.*

Despite Defendant's argument to the contrary, the patent expressly states "the present invention is intended to include all forms of communications network environments." '696 Patent col. 3:22–23. The specification gives many examples of communications networks, which are all included by the term. Not all examples, however, require interconnected computer systems, such as hard wired telephony or cellular networks. Thus, the additional limitations proposed by Defendant conflict with the specification.

Having resolved the present dispute, the Court will not provide additional construction of this term. *See O2 Micro*, 521 F.3d at 1362. Therefore, the Court construes "**communications network**" to have **plain meaning**.

### 4. "service data"

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "data that the remote service provider transmits to the user's computer during activation of the software application" | "any data that the remote service system may legitimately transmit to the user system during the online activation process for the software" |

The dispute again centers around whether the specification included an explicit definition for this term, and if so, the meaning of "legitimately transmit" and "online activation."

Uniloc asserts that the specification describes the function of service data as information transmitted by the remote service provider to the user, which enables a user to access a fully functioning version of the software upon receipt. Open. Br. at 11 (citing '696 Patent col. 5:19–30). It further asserts that its construction is a straightforward definition of the term that conforms to the described function. *Id.* Uniloc argues that including "legitimately" would require further construction or otherwise cause confusion. *Id.* at 12. Moreover, Uniloc asserts that inserting it is improper under the claim differentiation doctrine because Claim 1 recites "selectively" as a qualifier for "transmitted" while Claim 15 does not. Reply Br. at 5 (citing *Digital Vending Servs. Int'l. LLC v Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1274 (Fed. Cir. 2012)). Additionally, Uniloc contends that "online activation" is just one embodiment taught by the specification and inclusion of that term would exclude other embodiments, such as using a local area network (LAN) for activation. Open. Br. at 13 (citing '696 Patent col. 3:20–25). Uniloc contends that Defendant's argument that the claim language requires a network connection establishes that "online" is unnecessary. Reply Br. at 4.

In response, Defendant again asserts that the specification provided explicit definitional language for this term: "as used in this invention, service data is defined and understood herein and in all the claims to mean any data that the remote service system may legitimately transmit

to the user system during the online activation process for the software." Resp. Br. at 12 (quoting '696 Patent col. 5:19–23). Further, Defendant points out that Claim 15 introduces the function of "service data": "said user system being connected to a communications network to transmit user data and to receive said service data" and "a remote service computer system connected to said communications network . . . said remote service computer system transmitting said service data . . . ." *Id.* (quoting '696 Patent col. 10:45–59). Defendant argues this language shows that service data is required to activate the software application and is transmitted over a "connected activation system." *Id.* at 12–13. Defendant asserts that "legitimately transferred" makes sense because the transmission of data is required to activate the software, it must be permitted and therefore, legitimate. *Id.* at 13. Additionally, Defendant notes that the claim language requires a connection between the user system, communications network, and the remote service system to transmit the service data. *Id.* Thus, it contends this requirement supports its construction that includes "online." *Id.*

As Defendant points out, the specification provides an explicit definition of service data. '696 Patent col. 5:20–22. However, the '696 Patent uses "online" in the context of the plain meaning of "communications network." "Online" simply means that the systems are connected through a communications network. As previously discussed, "communications network" includes all forms of communications network environments. For example, "online activation" may take place either with a user and remote service system connected through the Internet or over a LAN connection.[2] *See* '696 Patent col. 3:20–36. Regarding "legitimately," the definitional language of the specification includes it. '696 Patent col. 5:22. Although the

---

[2] At the *Markman* hearing, Uniloc stated that they could accept Defendant's construction in light of the Court's clarification that "online" included the communications networks disclosed in the specification. Tr. *Markman* Hr'g 62–63, Sept. 18, 2014.

specification refers to legitimate users in other instances, here it refers to data transmitted by the remote service system to activate the software. Therefore, it is unclear what the term adds to the construction of "service data" because the patent teaches that the remote service system authenticates the software, not the other way around. Presumably, the remote service system would always transmit legitimate data. Although the exact purpose of "legitimately" may be unclear, the patentee's definition governs.[3] *See Phillips*, 415 F.3d at 1316 (Fed. Cir. 2005).

Accordingly, the Court will adopt Defendant's proposed construction.[4] The Court construes "**service data**" to mean "**any data that the remote service system may legitimately transmit to the user system during the online activation process for the software**"

### 5. "user data"

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "any information originating from and/or available to the user and/or the user computer system" | "any information originating from and/or available to the user of the software" |

This dispute focuses on whether "user data" must be accessible to the user and includes information about the user's system. Uniloc recognizes the definitional language provided in the specification: "any information originating from and/or available to the user of the software." Open. Br. at 13 (quoting '696 Patent col. 3:54–56). However, Uniloc asserts that the construction must include user data that is automatically detected. *Id.* 13–14. For support, Uniloc points to a few lines above in the specification where it states "the user data may be automatically detected by element for detecting user data of the remote service system." *Id.*

---

[3] At the *Markman* hearing, the parties represented that they had no significant issues with including "legitimately" and could not articulate a strong reason why it need to be included or excluded. Tr. *Markman* Hr'g 57, 60–61, Sept. 18, 2014.

[4] Uniloc argues that Defendant erroneously includes "any" in its proposed construction because it is not included in the cited language of the specification. Reply Br. at 4. However, upon the Court's review, "any" does appear in the cited language. '696 Patent col. 5:21.

(quoting '696 Patent col. 3:47–49). Additionally, Uniloc cites the specification following the definitional language where it clarifies that "user data" may include information identifying the user's software, such as serial number or identification code, or system, such as "such as serial and model number as well as the type, function, and performance of the various system hardware components." *Id.* at 14 (quoting '696 Patent col. 3:58–64, 4:14–18). Uniloc contends that Defendant's construction improperly excludes examples disclosed in the specification by limiting it to data concerning or input by the users themselves. *Id.* 14–15; Reply Br. at 5.

Defendant responds that Uniloc attempts to insert additional language into the explicit definition provided by the patentee. Resp. Br. at 14. According to Defendant, the definition clearly states that "'user data' is information from or available to a user of the software application." *Id.* Defendant argues that any additional features about the data, such as those in the examples cited by Uniloc, are incorporated in the claims themselves rather than the concise definition in the specification. *Id.* Defendant objects that Uniloc interprets "user" to also mean "user computer system." *Id.* at 15.

Moreover, Defendant asserts that prosecution history estoppel precludes Uniloc from including this meaning. It argues that the patentee differentiated the '696 Patent in order to overcome a rejection in light of U.S. Patent No. 6,243,468 ("Pearce"):

> Pearce discloses that the software application installed on the user's computer generates a hardware ID based upon hardware components installed in the computer running such software. This hardware ID is not derived from personal information that identifies the user; rather it is based upon characteristics of hardware components that are installed in the user's machine . . . . Thus, in Pearce, the user obtains the registration ID from the registration authority without submitting any personal user data. Moreover, in Pearce, the software application on the user's computer runs a test each time the software is launched. In contrast, the method of claim 1, *the user must submit personal identifying data to the remote service computer . . . .*"

Resp. Br. at 15 (quoting Ex. D at 9–10, Amendment, U.S. Patent Application No. 09/594,004 (September 2, 2004)) (emphasis added). Defendant asserts that the patentee similarly explained that Pearce does not use personal data to distinguish now-issued Claim 15 in the same Amendment. *Id.* at 16.

Uniloc argues that Defendant takes the patentee's statements in the prosecution history out of context. Reply Br. at 6 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 824 (Fed. Cir. 1992), *abrogated on other grounds*, *Markman v. Westview Inst.*, Inc., 52 F.3d 967 (Fed.Cir.1995) (en banc ) *aff'd*, 517 U.S. 370 (1996) ("Every statement made by a patentee during prosecution to distinguish a prior art reference does not create a separate estoppel. Arguments must be viewed in context.")). It further argues that prosecution history estoppel does not apply because the amended and issued version of Claim 15 actually broadened the claim by removing the personal data limitations. *Id.* (citing Ex. A at 5, 14, Amendment, U.S. Patent Application No. 09/594,004 (November 19, 2004); Ex. F to Resp. Br. at 7, Amendment, U.S. Patent Application No. 09/594,004 (June 21, 2005)).

The explicit definition of "user data" in the specification conforms to the various examples provided. At the *Markman* hearing, Defendant argued that "available" means the user can actually access and see the data. Tr. *Markman* Hr'g 41, 49, Sept. 18, 2014. In Defendant's view, an identification code that the user cannot actually read, such as an encrypted identification code, does not qualify as available, even though the user may be able to transmit such data. Defendant also argued that the data must personally identify or originate from the user and not the user's system. Tr. *Markman* Hr'g 39–40, Sept. 18, 2014. In Defendant's view, a user's system's serial and model number would not fit the definition of user data. However, the specification expressly includes a user's system's model and serial number in its examples of

user data. '696 Patent col 4:14–18. It provides additional examples of user data as including "identification code," "product serial number," and "information identifying the user system such as serial and model number as well as the type, function, and performance of the various system hardware components." '696 Patent col. 3:62–65, 4:15-18. The Court rejects Defendant's argument that this information may not be accessible to the user and therefore not "available" or "originating" from the user.

Additionally, in light of the context of all amendments during prosecution and the final version of Claim 15, Defendant's prosecution history estoppel argument lacks support. The claim limitations on user data—requiring it to derive at least in part from personal data entered by the user—added in the September 2004 Amendment were later removed by broadening amendments. *See* Ex. F to Resp. Br. at 5, 7, Amendment, U.S. Patent Application No. 09/594,004 (June 21, 2005). At the *Markman* hearing, Defendant itself noted that an Examiner previously rejected the '696 Patent in view of U.S. Patent No. 6,725,260 to Philyaw because "user data" included information about the user's software or hardware. Tr. *Markman* Hr'g 40–41, Sept. 18, 2014. The patentee did not disavow the Examiner's interpretation, but instead distinguished the invention by adding other patentable limitations, such as tracking the number of times a user attempts to activate the software. *See id.* at 5–6, 19–20 (noting the amendments made the invention distinguishable from Philyaw).

Therefore, the Court construes "**user data**" to mean "**any information originating from and/or available to the user of the software**." "Available" includes information the user can transmit even if the user not cannot access or read it.

**6. "user data being derived at least in part from said unique identification code;" and "derived"**

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| construction not necessary, but if construed:<br><br>"[user data] obtained at least partially from [unique identification code]" | "[user data] being processed at least in part from said [unique identification code]" |
| construction not necessary, but if construed:<br><br>"obtained at least partially from" | "processed" |

The Count considers these two terms together because the dispute over both turns on the meaning of "derived." Uniloc asserts that no construction is necessary because of the Court's construction of surrounding terms. Open. Br. at 17 (citing *Internet Machs. LLC. v. Alienware Corp.*, No. 6:10-cv-23, 2011 WL 2551295, at *7 (E.D. Tex. June 24, 2011)). Uniloc objects to replacing "derived" with "processing" because the words are not synonymous. *Id.* at 17–18 (citing *Webster's Encyclopedic Unabridged Dictionary of the English Language* 536 (1996); *Microsoft Computer Dictionary* 5th Ed. (1999) ("to manipulate data a program")). Uniloc argues that Defendant attempts to argue that derived, processed, and transformed all mean the same thing. Reply Br. at 7. Uniloc points out that Defendant's construction would exclude a disclosed embodiment where the user data is identical to the identification code. Open. Br. at 18. Uniloc also points to the specification's teaching that the unique identification code "may also be synonymous to a product's distinct serial number." Reply Br. at 7 (citing '696 Patent col 4:2–3). Uniloc contends that such embodiments would not require "processing." Open. Br. at 18. Uniloc further asserts that the plain meaning conveys that at least part of the user data is obtained from the unique identification code as taught by the patent. *Id.* (citing '696 Patent col. 3:59–64).

Defendant responds that the patentee's use of "derived" suggests a derivation or transformation. Resp. Br. at 16. Defendant argues that Uniloc attempts to rewrite the language of the claim by asserting that "user data" could simply "include" the identification code. *Id.* at 17. Defendant cites a technical dictionary to support its position that "derived" means "processed":

> [a] derived class, in the context of C#, is a class created, or derived from another existing class. The existing class from which the derived class gets created through inheritance is known as a base or super class. While inheriting from the base class, the derived class implicitly inherits all the members (except constructors and destructors) which it reuses, extends, or modifies the behavior of the base class.

*Id.* at 18 (quoting Ex. E, *Techopedia*, available at http://www.techopedia.com/definition/27363/-derived-class-net (last visited 5/22/2014)).

"[C]laim terms carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (internal citation omitted). Although the patentee repeatedly acted as his own lexicographer in the '696 Patent specification by providing explicit definitions of claim terms, the patentee did not unequivocally impart a novel meaning for "derived." Intrinsic evidence does not support equating "derived," "transformed," and "processed," as Defendant attempts. Instead, the claim language and examples given in the specification support the commonly understood meaning that at least some part of the user data is obtained from the unique identification code. The user data may also be identical to the unique identification code. '696 Patent col. 3:60–65. Moreover, Defendant's own extrinsic evidence undercuts its argument that "derived" requires a transformation. As previously quoted, *Techopedia* states that members of the "base class" can be simply reused for the "derived class."

Accordingly, the Court construes "**user data being derived at least in part from said unique identification code**;" and "**derived**" to have **plain meaning**.

**7. "predetermined threshold"**

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| construction is not necessary, but if construed:<br><br>"an established limit" | "a predetermined number limit" |

At the *Markman* hearing, the Parties agreed to the Court's suggested construction of "a numerical based limit." The only remaining issue is whether the term encompasses a temporal element to the limit, such as a limit of three times per day.

Uniloc argues that Defendant's proposed construction requires a lifetime maximum number and improperly excludes a temporal element to the limit. Open. Br. at 19. It asserts that the claim language supports a limit associated with a timeframe. *Id.* Uniloc acknowledges that the specification does not expressly disclose an associated timeframe, but points out that Federal Circuit precedent does not require a patentee to describe every conceivable embodiment. Reply Br. at 9 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Defendant argues that the '696 Patent does not support Uniloc's suggestion that "the claim requires or the specification explains that there is a timeframe under which the 'predetermined threshold' would expire." Resp. Br. at 20 n.4. However, at the *Markman* hearing, Defendant stated that the term does not exclude a timeframe associated with a number limit. Tr. *Markman* Hr'g 82, Sept. 18, 2014.

Essentially, the Parties agree that the limit may be associated with a timeframe, although the '696 Patent does not require a timeframe. Accordingly, the Court construes "**predetermined**

**threshold**" to mean "**a numerical based limit**."  A numerical based limit with a temporal element is included within the meaning of this term, but a temporal element is not required.

### 8. "activation code sequence"

| Uniloc's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| construction is not necessary, but if construed:<br><br>"a known code sequence needed to activate software" | "a program code sequence that serves to activate each individual software application, which, absent the activation code, would be dysfunctional" |

The dispute over this term focused on Defendant's use of "dysfunctional" in its proposed construction, but the Court resolved the dispute at the hearing.  Uniloc argued that "dysfunctional" could be interpreted to mean "completely dysfunctional," which would exclude disclosed embodiments that "allow partial[ly] functional software even before activation." Open. Br. at 16.

Defendant's proposed construction comes from the specification.  Defendant asserted the patentee provided another explicit definition: "[t]he activation code, as noted earlier, is a program code sequence that serves to activate each individual software application, which, absent the activation code, would be dysfunctional."  Resp. Br. at 20 (quoting '696 Patent col. 5:29–32).  Defendant contended that whether the software is completely or partially dysfunctional must be determined from the claim language.  *Id.* at 21.

To address this dispute, the Court suggested replacing "dysfunctional" with "either partially or completely dysfunctional."[5]  Both parties agreed to the Court's suggestion.  Tr. *Markman* Hr'g 88–89, Sept. 18, 2014.  Accordingly, the Court construes "**activation code sequence**" to mean "**a program code sequence that serves to activate each individual**

---

[5]  The specification describes "either partially or completely dysfunctional." '696 Patent col. 3:66.

**software application, which, absent the activation code, would be either partially or completely dysfunctional**."[6]

**CONCLUSION**

The Court hereby **ADOPTS** the above claim constructions for the patent-in-suit. For ease of reference, the Court's claim interpretations are set forth in a table in Appendix A.

**Dec 15, 2014**

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

---

[6] As in the Court's construction of "unique identification code," "program code sequence" includes long or short code. It is not limited to codes generated by a computer.

| Claim Term | Court's Construction |
|---|---|
| "unique identification code" | "a program code sequence comprised of alphanumeric characters, that would serve to identify each individual software application." |
| "software application having unique identification code associated therewith," "said software application assigned to such unique identification code," and "assign" | plain meaning |
| "communications network" | plain meaning |
| "service data" | "any data that the remote service system may legitimately transmit to the user system during the online activation process for the software" |
| "user data" | "any information originating from and/or available to the user of the software" |
| "user data being derived at least in part from said unique identification code"; "derived" | plain meaning |
| "predetermined threshold" | "a numerical based limit" |
| "activation code sequence" | "a program code sequence that serves to activate each individual software application, which, absent the activation code, would be either partially or completely dysfunctional" |